**Edward B. VANNESS, Appellant–Defendant.**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 48A02–9112–CR–00546.**

Court of Appeals of Indiana,
Second District.

Dec. 31, 1992.

Transfer Denied March 5, 1993.

William D. McCarty, Anderson, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Geoff Davis, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

BUCHANAN, Judge.

### CASE SUMMARY

Appellant-defendant Edward B. Vanness appeals his conviction for interference with custody,[1] a class D felony.

We affirm.

### FACTS

The facts most favorable to the judgment reveal that Cathy Baker (Baker) and Vanness were married in 1985. Their daughter, Elizabeth, was born on April 28, 1986. Baker filed for divorce in 1987 in the Madison County Superior Court. Vanness made several threats to Baker that if she pursued the divorce he would take Elizabeth out of the country and Baker would never see her again.

On December 8, 1987, Baker and Vanness signed a written agreement regarding Elizabeth's custody and visitation which provided in relevant part that:

> "The Wife [Baker] shall have custody of the minor child of the parties, Elizabeth Van Ness. The Husband [Defendant] shall have reasonable visitation with the child *when he is in this county*. Beginning the summer of 1988, the Husband shall have Elizabeth for one week visitation during the summer; he shall have visitation two (2) weeks during the summer of 1989; he shall have three (3) weeks visitation during the summer of 1990. When Elizabeth reaches the age of five (5) the Husband shall have her for the summer and the Wife shall have reasonable visitation of every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m."

*Record* at 332–34 (emphasis supplied). After the divorce, Vanness moved to Florida and he came back periodically to visit Elizabeth. On April 18, 1990, Vanness called Baker and they agreed that Vanness could pick up Elizabeth on Friday, April 20, and Baker would take Elizabeth back the following Monday. Vanness asked Baker to send some extra clothes with Elizabeth, and on Friday, Vanness gave Baker a check for $480 which represented eight weeks of child support. On Monday, April 23, Baker attempted to contact Vanness who was staying with his parents in Anderson, Indiana. Baker learned that Vanness left a note with his parents telling them he took Elizabeth to visit Haskell, one of his former girlfriends. Baker called Haskell and Haskell told her that Vanness had not visited since the previous Christmas.

Baker immediately called the police and a warrant was issued for Vanness' arrest. A writ of attachment was also issued. Baker

---

**1.** Ind.Code 35–42–3–4.

learned that Vanness had closed a money market account on April 16, 1990 valued at $161,660, and the $480 support check was returned for nonsufficient funds. The police learned that Vanness took Elizabeth to a car lot and sold his van for $2,400 in cash. The car lot owner discovered that Vanness left several brochures in the van advertising travel to New Zealand and Australia. On May 18, 1990, the Madison County Welfare Department received a letter from Vanness which was post-marked from Australia.

On October 22, 1990, Arizona police officers found Vanness and Elizabeth living in a motor home parked off a main highway. Elizabeth, who was four years old, told a policeman that her name was Mary. Her hair was bleached blonde, and Elizabeth told an officer that Vanness said her mother was dead. Vanness purchased the motor home in September, 1989, under the alias of "John R. Stone." The real John Stone, a former friend of Vanness, discovered that his birth certificate was missing.

When the police searched the motor home, they found receipts issued to John Stone for the motor home's purchase. They also seized a flyer advertising a confidential Australian remailing service, John Stone's birth certificate, a checkbook for the account of John Stone, and a Florida driver's license in the name of John Stone which was signed in Vanness' handwriting.

When Elizabeth was found, Baker flew to Arizona. Elizabeth told Baker that her name was "Beth Stone," and she displayed a blank expression. Vanness was arrested and charged with violating the custody decree. On August 7, 1991, Vanness was found guilty following a jury trial. One day later, the State filed a motion for payment of restitution on Baker's behalf. A hearing was held, and Vanness was ordered to pay Baker's expenses relating to her search for Elizabeth.

## ISSUES

Vanness raises the following issues for our review:

1. Did the trial court properly refuse to give two of Vanness' tendered instructions?

2. Whether the trial court properly admitted the writ of attachment into evidence?

3. Whether the trial court properly excluded the testimony of an attorney who would have testified about her interpretation of the custody order?

4. Did the trial court properly order Vanness to pay restitution to Baker?

5. Was the evidence sufficient to show that Vanness removed Elizabeth from the State in violation of the custody order?

## DECISION

ISSUE ONE—Did the trial court properly refuse to give two of Vanness' tendered instructions?

PARTIES' CONTENTIONS—Vanness argues that the two refused instructions were correct statements of the law, and that the subject matter of the rejected instructions were not covered by those actually given. The State responds that Vanness' instructions contained incorrect statements of law, and the substance of the refused instructions was adequately covered by those instructions actually given.

CONCLUSION—The trial court properly refused to give two of Vanness' instructions numbered three and four.

In determining whether the trial court erred in refusing to give proposed instructions, this court must determine whether the instructions correctly state the law, whether there was evidence to support the giving of the instructions, and whether the substance of the refused instructions was adequately covered by the other instructions that were given. *Brown v. State* (1991), Ind., 577 N.E.2d 221; *Evans v. State* (1991), Ind., 571 N.E.2d 1231.

At trial, Vanness submitted the following instructions:

"INSTRUCTION NO. 3

I.C. 35–42–3–3 applies only to child custody orders that specifically prohibit the

removal of a child from the State of Indiana.

### INSTRUCTION NO. 4

In the absence of specific restrictions in the custodial order, a custodial or non-custodial parent who removes the child from the State either with bad intent or with no intent whatsoever to violate the terms of the order does not violate the law as removal by the parent must violate a specific provision of the custody order."

*Record* at 60B, 60C.

■ Vanness was charged with violating I.C. 35–42–3–*4*, (interference with custody) and the jury was instructed as to the elements of that offense. *Record* at 38–39. Vanness' instruction numbered three quoted above cites to the Criminal Confinement statute (I.C. 35–42–3–3) which is not at issue in this case. Obviously it is not error for a trial court to refuse an instruction unless it ought to be given as tendered. *Jones v. State* (1983), Ind., 445 N.E.2d 92; *McCormick v. State* (1982), Ind., 437 N.E.2d 993.

■ The substance of Vanness' instruction numbered four cited above was adequately covered by the other instructions the trial court gave. The jury was properly instructed that the State had the burden of proving that the removal violated a child custody order. *Record* at 38–39. While Vanness argues that it was error to refuse this instruction, there is no difference between instructing the jury that guilt requires proof that removing a child violates a custody order, and that guilt requires proof that removal violated a *specific* provision of the order. The trial court went on to instruct the jury that IC 35–42–3–4 should be strictly construed and that any reasonable doubt concerning the interpretation of the statute to the facts of the case should be resolved in Vanness' favor. *Record* at 49.

The trial judge commented that instruction numbered four regarding a "specific provision" of the custody order might have been relevant had the custody order been vague. However, the custody order cited above is quite detailed in that it contained *specific* restrictions regarding custody and visitation. *Record* at 531–34.

Because the trial court fully set out the statutory definition and elements of the offense charged in other instructions, there was no need to give instructions three and four.

ISSUE TWO—Whether the trial court properly admitted the writ of attachment against Vanness into evidence?

PARTIES' CONTENTIONS—Vanness claims that introducing the writ of attachment into evidence which had been entered by the Madison County Superior Court in the dissolution proceeding was irrelevant. The State responds that the writ of attachment was relevant to demonstrate that Vanness left the jurisdiction in violation of the custody order.

CONCLUSION—The trial court did not err in admitting the writ of attachment into evidence.

■ The writ of attachment Baker requested provided in relevant part:

"Comes now Cathy G. Baker, formerly VanNess, and she having filed her verified Affidavit for Contempt and for Writ of Attachment which Affidavit is in the words and figures following, to-wit: (H.I.)

And the Court having read said verified Affidavit and being duly and fully advised in the premises, now finds that the allegations set forth in said verified Affidavit are true and that a Writ of Attachment should issue for Edward B. VanNess.

IT IS, THEREFORE, CONSIDERED, ORDERED AND ADJUDGED BY THE COURT that: ... said Edward B. VanNess be confined upon service of this Writ of Attachment until such time as he appears before this Court to address the issue of the violation of the custody order previously issued by this Court."

*Record* at 350.

Evidence is relevant, and thus admissible, if it tends to prove or disprove a material fact or sheds any light on the guilt or

innocence of the accused. *Davidson v. State* (1990), Ind., 558 N.E.2d 1077; *Brown v. State* (1985), Ind., 480 N.E.2d 938. The trial court is vested with wide latitude to determine the probative value of evidence and its prejudicial impact, and its rulings will be reversed only if there is an abuse of discretion. *Labelle v. State* (1990), Ind., 550 N.E.2d 752; *Fisher v. State* (1989), Ind., 541 N.E.2d 520.

Baker testified that she believed Vanness fled the State, so she applied for the writ of attachment in the Madison County Superior Court and set forth the reasons supporting her claim that Vanness left in violation of the custody order. The trial judge could certainly find that this evidence was relevant, and he properly exercised his discretion in admitting the writ of attachment into evidence.

ISSUE THREE—Should the trial court have excluded the testimony of Vanness' attorney who represented him in the dissolution action?

PARTIES' CONTENTIONS—Vanness argues that the attorney who represented him in the dissolution action was entitled to present expert testimony that the decree did not prevent him from removing Elizabeth from the state. The State maintains that the decree was unambiguous and expert testimony was not needed to interpret the decree's language.

CONCLUSION—The trial court properly excluded the testimony of Vanness' divorce counsel.

■ An expert witness is one who by reason of education or special experience has knowledge of a subject matter about which persons having no particular training are incapable of forming an accurate opinion or making a correct deduction. *See Corbin v. State* (1990), Ind., 563 N.E.2d 86; *Wissman v. State* (1989), Ind., 540 N.E.2d 1209. While an expert may give an opinion on a matter unrelated to the experience and knowledge of the average juror, opinions are not permitted when the jurors are as well qualified to form an opinion upon the facts as the witness. *Reburn v. State* (1981), Ind., 421 N.E.2d 604; *Montgomery Ward & Co. v. Gregg* (1990), Ind.App., 554

N.E.2d 1145, *trans. denied.* The trial court has broad discretion in determining whether to allow expert opinions and we will reverse only for an abuse of discretion. *Wade v. State* (1986), Ind., 490 N.E.2d 1097.

■ The language providing for visitation in the decree was written in plain, non-technical language that could be easily interpreted by laypersons. It is free from legalese or words of art that would require the opinion of an expert attorney to aid in the interpretation and understanding thereof.

When Vanness made an offer to prove regarding the substance of the attorney's testimony, his counsel's opinions were expressed by *only* responding "no" to the questions asked. *Record* at 503–04. She did not explain the basis and reasoning behind her conclusions. Mere conclusions should not be allowed as expert opinions and they are inadmissible. *Marks v. Gaskill* (1989), Ind.App., 546 N.E.2d 1245; *Rosenbalm v. Winski* (1975), 165 Ind.App. 378, 332 N.E.2d 249.

The expected testimony of Vanness' dissolution attorney was properly excluded inasmuch as expert opinions are inappropriate in matters of common knowledge.

ISSUE FOUR—Did the trial court properly order Vanness to pay restitution to Baker?

PARTIES' CONTENTIONS—Vanness claims that the award of restitution is contrary to law and is unsupported by the evidence, and that authorization for costs does not permit an award of attorney fees. The State responds that sufficient evidence was presented to support the order of restitution for costs that Baker incurred including lost wages, medical bills, travel expenses, and attorney services.

CONCLUSION—The trial court acted within its discretion in ordering Vanness to make restitution to Baker for the costs she incurred as a result of Vanness' crime.

■ Ind.Code 35–42–3–4 (1990) is a recent statute that specifically provides in section 4(e) for the imposition of reasonable

costs incurred because of the taking of the child:

> "If a person is convicted of an offense under this section, *a court may impose against the defendant reasonable costs incurred by a parent or guardian of the child because of the taking, detention, or concealment of the child.*"

IC 35–42–3–4(e). (Emphasis supplied). *See also* Ind.Code 35–50–5–3(a).[2]

Our supreme court has determined that restitution may be paid to those shown to have suffered injury, harm, or loss as a direct and immediate result of the criminal acts of a defendant. *See e.g. Reinbold v. State* (1990), Ind., 555 N.E.2d 463 (order of restitution against defendant was proper for murder victim's funeral and burial expenses and for child support for the victim's surviving children). The order of restitution is a matter within the trial court's discretion and we will reverse only when an abuse of discretion occurs. *Mitchell v. State* (1990), Ind.App., 559 N.E.2d 313, *trans. denied.* No abuse here.

Baker filed a detailed list with the trial court of costs she incurred, and she testified as to how she incurred those expenses totaling $36,718.60. *Record* at 606–25. While searching for Elizabeth, Baker spent sixty dollars per week on gasoline and she had to purchase new tires for her automobile. *Record* at 609–10. Baker and three others traveled to South Carolina to talk with an international child rights advocate. *Record* at 612–13. She incurred a $1,400 expense on air fare and hotel bills for sending a couple to Mexico with flyers and pictures of Elizabeth after Baker received a lead that Vanness may have fled to Mexico. *Record* at 613–14. Baker also drove to Florida several times to search for Elizabeth. She testified that it took four people because of the exhausting drive. One of the people delivered subpoenaes, and the

others helped drive and assist with the paperwork. *Record* at 614, 626. Baker also spent money on medication for herself as a result of Elizabeth's disappearance, and she incurred expenses for counseling for Elizabeth and herself when they returned. *Record* at 615–16. $112.79 was spent on long distance calls to Baker's contact in Florida, *record* at 616, and Baker testified as to the expenses of round-trip plane tickets to Arizona when her family picked up Elizabeth. *Record* at 614–16. Baker spent nearly $150 for Elizabeth's hair which had to be cut and conditioned once a month, and she incurred an expense of about $220 for copies of bank records. *Record* at 617–18.

The trial court also awarded Baker $150 for the cost of two missing diamond earrings that Elizabeth wore when she left Indiana with Vanness. Elizabeth told Baker that Vanness threw them away. *Record* at 618. Baker also purchased a car seat that Vanness took when he left with Elizabeth and did not replace. *Record* at 618–19. Baker testified that she lost $8,450 in wages that she would have earned had she worked during the twenty-six weeks while searching for Elizabeth. *Record* at 619.

The State presented evidence that Baker incurred nearly $8,627.40 in attorney fees because of Vanness' crime. An affidavit of attorney Elizabeth Bybee stated that she performed legal services valued at $626.40 as a result of her attempts to locate Elizabeth. These services included drafting and filing pleadings, consultations, correspondence, and telephone calls.

Attorney David Puckett testified at the restitution hearing that Baker incurred $4,010 worth of costs for his services in an effort to locate Elizabeth. Puckett's rate was $100 per hour, and his work included the preparation of subpoenaes, the verifica-

---

**2.** "In addition to any sentence imposed under this article for a felony or misdemeanor, the court may ... order the person to make restitution to the victim of the crime. The court shall base its restitution order upon a consideration of:

(1) property damages of the victim incurred as a result of the crime, based on the actual cost of repair....

(2) medical and hospital costs incurred by the victim (before the date of sentencing) as a result of the crime; and

(3) *earnings lost by the victim* (before the date of sentencing) as a result of the crime including earnings lost while the victim was hospitalized or *participating in the investigation* or trial of the crime...." (Emphasis supplied).

tion of their service, and a consultation with Baker. *Record* at 630.

A billing statement of a Texas attorney was also included in the presentence report. His services amounted to $3,991 which included work involved in freezing Vanness' assets located in Texas so Vanness could reimburse Baker for the money she borrowed and spent in her efforts to locate Elizabeth. *Record* at 620–25. Baker testified that she would not have incurred these expenses had Vanness not removed Elizabeth from the jurisdiction. *Record* at 621.

While the general rule is that each *party* to the litigation must pay his own counsel fees absent a statute or agreement to the contrary, *see Department of Pub. Welfare v. Chair Lance Service, Inc.* (1988), Ind., 523 N.E.2d 1373; *Greensburg Local # 761 v. Robbins* (1990), Ind.App., 549 N.E.2d 79, *trans. denied,* that rule is inapplicable here.

Baker was a *victim* —not a party in this case—involving the State and Vanness. Thus, as discussed above, the award of restitution was within the trial court's discretion. In accordance with IC 35–42–3–4, we must conclude that attorney fees may be awarded as "reasonable costs *incurred by a parent* . . . of the child because of the taking, detention, or concealment of the child. . . ."

■ While Vanness argues that *State v. Holder* (1973), 260 Ind. 336, 295 N.E.2d 799, prohibits the payment of attorney fees as "costs," *Holder* was concerned with the payment of these fees as costs *directly involved in the litigation.* Unlike *Holder,* it is clear that the trial judge awarded attorney fees to Baker as a victim, i.e. the costs that she suffered as a result of Vanness' criminal offense. Baker made a specific showing that the expenses she incurred resulted from Vanness' taking, detention, and/or concealment of Elizabeth. Even if Baker were to be considered a "party" and so subject to the general rule that each party pays its own attorney's fees, the language "reasonable costs incurred by a parent" expresses a legislative intent to create an exception to that general rule. ("No rule is so general, which admits not some exception." R. Burton, *Anatomy of Melancholy,* [1577–1640]).

ISSUE FIVE—Was the evidence sufficient to support Vanness' conviction?

PARTIES' CONTENTIONS—Vanness argues that the conviction may not stand because the custody decree did not contain an express prohibition against removing Elizabeth from the State. The State responds that the custody decree limited Vanness' visitation to Madison County, Indiana and visits of predetermined length in the summers, and that Vanness' removal of Elizabeth from the State constituted a clear violation of the decree.

■ CONCLUSION—The evidence was sufficient to support the conviction. Vanness' argument that there is no *express* provision in the custody order against removal of Elizabeth from the State is quite plausible because indeed there is no such prohibition. The argument, however, is somewhat reminiscent of those made by the ancient Greek teachers (sophists) known for their clever but unsound arguments.

IC 35–42–3–4 provides in relevant part that:

"(a) A person who knowingly or intentionally:
(1) removes another person who is less than (18) years of age to a place outside Indiana when the removal violates a child custody order of the court . . .
commits interference with custody, a class D felony."

The custody order specifying Vanness' visitation rights with Elizabeth details the circumstances and limitations of Vanness' right to visitation. It says that Vanness "shall have reasonable visitation with the child when he is in this County" (Madison), and it placed geographical limitations on the times of visitation. The unmistakable implication of this order is that removal of Elizabeth from Indiana for a six-month period of time violates the order.

Buttressing our conclusion is *McNeely v. State* (1979), 181 Ind.App. 238, 391 N.E.2d 838, *trans. denied,* in which the defendant

violated a custody order and removed his minor son from Indiana to Florida. The custody order provided that McNeely, the noncustodial parent, was to have custody of the child for two weeks during the summer, and custody from 5 p.m. Friday to 5 p.m. Sunday on each weekend of every month except the first full weekend of each month when custody would extend from 10 a.m. Sunday to 5 p.m. Sunday. Sixteen days after McNeely took his son to Florida, he was charged with child stealing[3] and convicted. In affirming the conviction, this court observed that:

> "[W]e are convinced that any ordinarily intelligent parent having not lawful charge or custody of one's child who takes, leads, carries, decoys or entices such child with the intent to detain or conceal said child from the law-endowed custodial parent, knows that he is committing a crime, that is, stealing a child. Indeed, we cannot reasonably assume that the legislature would exempt a transgressing parent from what otherwise would constitute an act of child stealing by any other person."

*Id.* at 240–41, 391 N.E.2d at 840. As in *McNeely,* the custody order provided that the ex-wife was the custodial parent, and the father's removal of the child violated the decree.

Vanness relies upon *Cook v. State* (1989), Ind.App., 547 N.E.2d 1118, *trans. denied,* which reversed the noncustodial parent's conviction for criminal confinement when she removed her children from the state purportedly in violation of a custody order. In *Cook,* the custody order provided that the defendant "shall have the right to visit said children and have the children visit with her so long as she conducts herself properly and provides a proper environment for such visitations." *Id.* at 1119. This court determined that the confinement conviction could not stand because the decree in *Cook* did not specifically prohibit the defendant from removing the children from the State. Without *any determinable limits on visitation,* this court reasoned that the custody order could not

technically be "violated" by removing the children from the jurisdiction. *See also Clark v. Clark* (1980), Ind.App., 404 N.E.2d 23 (custody order providing that "it is in the best interest of the child and the parties herein not to have formal visitation hours, but to allow visitation at the convenience of the child and the parties herein" was too vague to be construed as a court order which would support a contempt finding when the noncustodial parent refused to return the child after an agreed upon visitation period had ended).

Unlike the decree in *Cook,* the custody order before us clearly included predetermined limits as to Vanness' visitation rights. Even if it could not be so broadly interpreted so as to impose *geographical* limitations regarding visitation, removal of Elizabeth for a six-month period was obviously not contemplated by the order.

In light of the above, the evidence was sufficient to support Vanness' conviction for interfering with the custody decree.

Judgment affirmed.

ROBERTSON, J., concurs.

SHIELDS, J., concurs with separate opinion.

SHIELDS, Judge, concurring.

Although I agree that Vanness's conviction for interference with custody should be affirmed, I disagree with the majority opinion in two respects.

In my opinion, the trial court erroneously admitted the writ of attachment into evidence. A prior civil judgment is admissible as proof of the judgment's existence and of the legal consequences that could result from that fact. *Indiana State Highway Commission v. Rickert* (1981), Ind., 425 N.E.2d 620, 622–23. However, a judgment cannot be offered as proof of some fact upon which the judgment was founded, because the judgment is not binding upon anyone except parties thereto. *Lasher v. Gerlach* (1939), 107 Ind.App. 572, 580, 23 N.E.2d 296, 299. Thus, the trial court improperly admitted the writ of attachment to

**3.** Ind.Code 35–1–55–2. (Repealed).

demonstrate that Vanness left the jurisdiction in violation of the custody order. However, in view of the overwhelming evidence against Vanness, the error is harmless.

I also disagree with the implication in the majority opinion that Vanness's conviction would be sustainable if the custody order had not specifically imposed geographical limitations regarding visitation. As this court stated in *Cook v. State* (1989), Ind. App., 547 N.E.2d 1118, *trans. denied:*

> [I]n the absence of specific restrictions in the custodial order, a custodial or non-custodial parent who removes the child from the state either with bad intent or, perhaps, with no intent whatsoever to violate the terms of the order, does not violate the letter of the law.... We find that the statute means what it says, that the removal by the parent must violate a specific provision of the custody order.

*Cook*, 547 N.E.2d at 1123. Thus, had the present order not imposed specific geographical limitations, it would have had to state that Elizabeth could not be removed from the State for the fact finder to have found that Vanness violated the custody order within the meaning of IC § 35–42–3–4.